**United States District Court**
**For The Northern District of Texas**
**Dallas, TX**

Civil Action NO. 3:11-CV-0456-G
Plaintiff: Travelhost, Inc.  vs. Defendant:  Trent Modglin

# Counterclaim by Defendant

Defendant, Trent Modglin, hereby files this counterclaim to the complaint filed by Plaintiff on June 14, 2011. Defendant alleges the following:

<u>History of fraud and false inducement</u>
Franchisee prospects are invited to Travelhost headquarters in Dallas for what is labeled as a "Day of Discovery," which is where the fraud violations begin. At this Day of Discovery, Travelhost executives describe and present the differences between a distributor agreement and an associate publisher agreement. The entire day, Travelhost suggested that Mr. Modglin was in a fierce competition with other viable candidates, stemming from an extensive recruiting process to find the right person for the Chicago market. As always, promises for a rewarding lifestyle of flexible hours and an enormous income were made with regularity. Any and all verbal and video testimonials on Travelhost's website or online ads when representing the earnings potential of the business feature the most successful associate publishers in the nation, which is not typical for the rest of the investors.

During the Day of Discovery, Travelhost routinely described in great length the success of a few select associate publishers, most notably Ina Lee in Fort Lauderdale and the Branson market. Travelhost promised future success and touted the dominance of the company and its trademark, reputation, etc., and how the positive impact of being an associate publisher tied to the Travelhost name would open countless doors in regard to potential advertisers and distribution points. Problem is, at no point did Travelhost ever mention the negative press it had received, including among its own associate publisher network and in the media, not to mention in the Chicago market, where Travelhost's brand name was as valuable as a scarlet letter for many hotels and potential advertisers. In fact, one Travelhost competitor who tried to hire Mr. Modglin after Mr. Modglin terminated his agreement with Travelhost, told him that Travelhost had sold the Chicago market to approximately nine different associate publishers in the last 20 years. This tarnished market expressed a lack of continuity – and a damaging trend -- with the Travelhost. The same brand that had been so built up with positive vibes during the Day of Discovery and in numerous phone conversations with Travelhost executives prior to signing the agreement.

Mr. Modglin asked Travelhost's Roger Thrailkill and Kirk Smith for the prior success rate of the Chicago market, as well as the success rate of associate publishers across the country, but both Thrailkill and Smith insisted that Travelhost is the No. 1 travel magazine in the market and does not keep records of failed markets, which represents a false representation meant to induce Mr. Modglin into entering the agreement. It's fair to say if Smith and Travelhost were ever forced to disclose the failure rates, which they are in possession of, that Mr. Modglin would never have entered into the agreement, no would many other self-respecting prospects.

During the Day of Discovery, Mr. Modglin was told by Travelhost that the printing prices for associate publishers were "wholesale," and the wholesale description is in the agreement throughout. This is a

false representation directly intended to induce Mr. Modglin into believing they were getting a "wholesale" price break and to enter into the agreement.

Under the associate publisher agreement, Mr. Modglin was entitled to a national advertising space credit of $75,000, a condition that entices new prospects, like Mr. Modglin, into executing the associate publisher agreement. The advertising space, our research indicates, is very rarely sold by any an associate publisher in the designated timeframe, if ever. Travelhost is well aware that the likelihood of selling this national space for any value is extremely low, and for $75,000, it is downright impossible. The representation that the associate publisher is actually receiving this phantom $75,000 credit is absolutely false and created by Travelhost to induce potential associate publishers, like Mr. Modglin, into executing the agreement.

As a result of the misguided and repeated promises of success, and Travelhost's conscious decision to avoid disclosing the high failure rates, Mr. Modglin entered into the associate publisher agreement. Travelhost's representations to Mr. Modglin and other candidates were false statements of fact, as well as false promises of future performance.

Rather than achieving the success that was made to look like the norm by Travelhost executives, Mr. Modglin was forced to pay printing prices that were significantly higher than he could have received retail and was mislead by false information about the potential – and expectations – for success in the Chicago market.

In the midst of his agreement, Mr. Modglin regularly met hotel representatives and potential advertisers who had long ago soured on the Travelhost brand and wanted nothing to do with him as long as he represented the company, in large part because of 1.) The outdated look and design of the magazine, 2.) A distrust of the company as a whole and 3.) The lengthy lack of success and stability in the Chicago market.

In fact, several potential advertisers indicated they were still owed money by previous associate publishers due to them shutting down operations while still owing advertising space that had been paid for in advance.

During the course of his time with Travelhost, Mr. Modglin learned of the negative sentiment circulating among the associate publisher network, spurred on by a pair of internet blogs explaining the fraudulent activities and negative aspects of doing business with Travelhost.

Despite being made aware of the negative press and sentiment, as well as the tarnished brand, Travelhost consistently failed to protect the goodwill associated with the trademark, which in turn, severely damaged Mr. Modglin's ability to resurrect an already tainted Chicago market and have a legitimate opportunity to sell advertising and establish a respectable distribution list.

Travelhost thrives on its tremendous turnover by fraudulently inducing the next round of unassuming associate publishers to enter into the same agreements, frequently reselling spoiled markets to new franchisees who have no chance of success because of the tremendously bad reputation that attaches to the Travelhost brand.

Travelhost's Kirk Smith made a direct attempt to convince Mr. Modglin to defraud his advertisers by advising him to skip a month of printing but not tell his advertisers, all the while continuing to invoice

them in an effort to get ahead financially. This conversation, later denied via email, was overheard via speaker phone by former marketing director Mike Peterson, who is willing to testify as such.

Travelhost breached the associate publisher agreement by failing to protect the goodwill associated with the limited license of the Travelhost trademark purchased by Mr. Modglin, an implied duty under such an agreement. It also failed to register as a franchise in the state of Illinois and committed consumer fraud and common law fraud.

Travelhost engages in gross misrepresentation and false advertising of their numbers in the Travelhost national media kit, through the associate publisher recruitment process and online. Travelhost offers bloated figures regarding hotel rooms, circulation, markets, etc. At one point, Travelhost was advertising more than 125 markets, when there were approximately 80 markets or fewer in business. In addition to being fraudulent, this makes it nearly impossible for associate publishers to sell the national advertising that they promote. Travelhost also continues to use the magazine copy online of regions that are no longer publishing, which gives the indication Travelhost is found in more markets than it really is.

Franchise disclosure violations

Criteria for franchises
1. The right to use a trade name (Travelhost and its brand).
2. Payment for that right (Initial purchasing fee of $60,000 for an associate publisher agreement plus a 200-percent premium on the printing of the magazine, marketing assistance, etc.
3. Significant control and/or marketing and sales assistance (mandatory TIPS class; binders of sales, marketing and design instructions; regular webinars, mandatory layout regulations; regional AP meetings; best practices seminars, etc.)

Because Travelhost is not registered as a franchise, they aren't required to:
1. Disclose failure rates.
2. Provide contact info for past and present investors.
3. Disclose any litigation within the past 10 years.

**A 1989 FTC Advisory Opinion concluded that Travelhost magazine distributorships met the three elements of a franchise. In this situation, there was clearly the right to use the trade name and there was a payment of a fee. However, Travelhost argued that since there was no "prescribed marketing plan" the third element of a franchise was not satisfied. The FTC ruled that Travelhost clearly provided significant and detailed control and assistance to distributors in all aspects of the distributors' method of operation (including ad sales, composition and layout, and magazine distribution), as well as comprehensive manuals that provided step-by-step training in each subject.

"In this situation, there was clearly the right to use the trade name, and there was a payment of a fee. However, Travelhost argued that since there was no "prescribed marketing plan" the third element of a franchise was not satisfied. The FTC ruled that Travelhost clearly provided significant and detailed control and assistance to distributors in all aspects of the distributors' method of operation (including ad sales, composition and layout, and magazine distribution), as well as comprehensive manuals which provided step-by-step training in each subject." — (FTC Advisory Opinion, Travelhost Magazine, Inc. (March 2, 1989), Bus. Franchise Guide (CCH) ¶ 6444.:)

Violation of Illinois and Texas Business Opportunity Laws

Both Illinois and Texas have laws prohibiting the sale of business opportunities unless the seller gives potential purchasers a pre-sale disclosure document that has first been filed with a designated state agency. If a business opportunity seller is not required to provide pre-sale disclosures by the Franchise Rule, these disclosures will almost always be required by the laws of the included states.

The FTC rule defines a business opportunity as a relationship in which: (a.) the investor sells goods or services supplied by the seller or its affiliate, or by suppliers with which the seller requires the investor to do business; (b.) the seller secures retail outlets or accounts for the goods or services, or secures locations for vending racks or machines, or provides the services of someone who can perform either of these functions; and (c.) the investor must make a required payment to the seller or its affiliate of $500 or more from any time before to within six months after commencing operations in order to obtain or commence the venture.

Violation of Texas Deceptive Trade Practices Act

When a vendor or salesman uses false statements, duress, exaggerations or misleading advertisements to win business, they violate the Texas Deceptive Trade Practices Act. Vendors may violate the DTPA by claiming their product does something it does not or cannot do. Companies also violate the DTPA when they take advantage of a customer's lack of knowledge or language comprehension.

Examples of deceptive trade practices include:
1. False or misleading advertising
2. Exaggerating or misrepresenting the benefits or endorsements of a product or service
3. Making false statements about the manufacture or origin of a good/service

Committing common law fraud on a federal and state level

The five elements of common law fraud:
1.) A false statement of material fact
2.) Defendant's knowledge that the statement was false
3.) Defendant's intent that the statement induce plaintiff to act
4.) Plaintiff's reliance upon the truth of the statement
5.) Plaintiff's damages resulting from reliance on the statement

Committing consumer fraud on a federal and state level

1.) Deceptive act or practice -- Deception includes a failure to disclose as well as an affirmative misrepresentation.
2.) The defendant's intent that the plaintiff rely on the deception
3.) The deception occurred during trade or business

Breach of fiduciary duty

Travelhost engaged in a fiduciary relationship with Mr. Modglin, as it does with all of its associate publishers and distributors. However, by failing to protect the goodwill associated with the Travelhost trademark and by recklessly misrepresenting the associate publisher opportunity, Travelhost intentionally breached its fiduciary duty, forcing Mr. Modglin's hand to protect his already damaged

financial well-being. All the while Travelhost profited from Mr. Modglin's battle to withstand the mounting issues with a broken-down brand and overstated opportunities.

Realizing that success was not possible in the Chicago market for the foreseeable future because of the fraudulent details of the agreement, misleading information and promises, overstated value of consideration provided by Travelhost, the tarnished brand, outdated product, and Travelhost's failure to establish any goodwill in protecting its trademark and company reputation, Mr. Modglin made the decision to terminate the agreement on Dec. 9, 2009, pursuant to its terms. Mr. Modglin entered into the agreement based on the false representations made by Travelhost, and he suffered injury as a direct result of those representations.

**Damages and claims**

As a direct and adjoining result of Travelhost's conduct and unclean hands, Mr. Modglin suffered out-of-pocket damages, lost profits and exemplary damages.

Mr. Modglin's counterclaims include one count of false inducement, one count of breach of contract, one count of franchise disclosure violations, one count of common law fraud, one count of consumer law fraud, one count of breach of fiduciary duty and one count of violating the Texas Deceptive Trade Practices Act.

**Prayer**

The defendant (Mr. Modglin) in case No. 3:11-CV-0456-G respectfully requests that the court enters judgment against plaintiff (Travelhost) dismissing the original complaint, with prejudice, and awarding the defendant judgment for his actual damages, costs and attorney's fees (if necessary) and granting any further relief as the court may deem just and proper.

**Dated: September 28, 2011.**

**Signed:** _____ **/ Trent Modglin**